MARY J. BOYLE, J.:
{¶ 1} Defendant-appellant, William M. Jackson, III ("Jackson"), appeals his felonious assault and weapons disability convictions. He raises two assignments of error for our review:
1. The state failed to present sufficient evidence of the offenses charged.
2. Appellant's convictions are against the manifest weight of the evidence.
{¶ 2} Finding no merit to his appeal, we affirm.
I. Procedural History and Factual Background
{¶ 3} In June 2016, Jackson was indicted on three counts, including two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), both second-degree felonies, and one count of having a weapon while under disability, a third-degree felony. The felonious assault counts carried one-and three-year firearm specifications, as well as notice of prior conviction and repeat violent offender specifications. Jackson pleaded not guilty to the charges and waived his right to a jury trial. The following evidence was presented to the bench.
{¶ 4} The victim, Elliott Jackson ("Elliott," no relation to the defendant), testified that Jackson shot him just above his right eye on the afternoon of January 3, 2016, after the two of them "tussled" in *1151 Elliott's car. Elliott ended up losing his right eye as a result of the shooting.
{¶ 5} Elliott had been friends with Jackson's older brother Mario for many years. Although Elliott was friends with Mario, Elliott was not friends with Jackson and never really had much contact with him. Elliott explained that he knew Jackson as "Woo," and he did not learn Jackson's "given name" until after the shooting.[1]
{¶ 6} Elliott testified that the day before the shooting, he hung out with a male named Holland, who was an "associate" of his. When he dropped Holland off that night, Holland could not find his cell phone in Elliott's car. The two of them looked for it before Holland got out of the car, but they could not find it. Elliott found it later that evening, however, when he got home.
{¶ 7} According to Elliott, Holland's phone rang the following afternoon. Elliott saw that it was Jackson, so he answered it and said, "What's up? This is Bingo." Elliott did not think that Jackson knew that Elliott was going to answer Holland's phone, but he stated that Jackson did not act surprised when he did.
{¶ 8} Jackson told Elliott that he "wanted [Elliott] to put some money on [Mario's] books" because Mario was incarcerated in the county jail. Jackson had a warrant out against him at that time, so he could not go to the county jail.
{¶ 9} Elliott stated that Jackson asked Elliott to meet him at a mutual friend's house on Raymond Street. Elliott drove to the house and parked in the driveway, with the passenger side of the car closest to the house. He did not get out of the car. He called Jackson on Holland's phone and told him that he was there. Elliott testified that Jackson got in the car and asked him if he had talked to Mario. Elliott responded that he had not done so in a "couple of days." According to Elliott, Jackson began to take money out of his pocket, but then also "pulled out a gun" and said to Elliott, "You know what it is. Put your hands on the steering wheel." Elliott stated that Jackson had the gun in his right hand, but was not pointing it at Elliott.
{¶ 10} Elliott testified that he thought Jackson was going to shoot him or rob him, so Elliott "went for the gun" with his right hand. At that point, the two began "tussling" for the gun. Elliott said that Jackson shot "a round in the seat." According to Elliott, the top half of his body ended up in the back seat during the struggle, but his legs were still in the middle console in the front of the car. At some point, Jackson "dove out the back passenger door." Elliott could not see where Jackson was, but "all he knew was that gun went off" and he had been shot. Elliott "lifted up," closed his back passenger door, and drove himself to the hospital.
{¶ 11} Elliott explained that the door handle to his back passenger door was broken on the inside. To open the door from the inside, one had to roll the window down and open the door using the outside door handle. But Elliott said that there was a "trick" to opening the door from the inside "if you knew how."
{¶ 12} When Elliott got to the hospital, police searched his car. The driver's-side and passenger-side windows were down. There was a shell casing on the front passenger seat. There was blood on the rear seat as well as on the back of the passenger-seat head rest. There was also blood on the driver's seat and the steering wheel, but most of the blood was found "in the back passenger seat." Police did not find any bullet holes anywhere in the vehicle.
*1152 Elliott later identified Jackson in a photo array.
{¶ 13} Jeffrey Whitted, a good friend of Elliott's, testified that on the afternoon of January 3, 2016, he was also at the house on Raymond Street watching football. Jackson was also there. Whitted knew Jackson from school, and he used to work with him.
{¶ 14} Whitted testified that when Elliott arrived at the house that day, Elliott parked in the driveway, facing the house. Jackson went outside to meet with Elliott. Whitted was watching the game when he heard a horn beep. At that point, he looked outside and saw Elliott and Jackson wrestling. Whitted saw Jackson with a gun and saw "Elliott fighting for his life." Whitted then saw Jackson get out of the car through the back door, and Whitted saw that Jackson still had the gun. Whitted then saw Jackson on the ground outside of Elliott's car. At that point, Whitted said that Elliott was trying to close the back door of his car and that is when Whitted saw Jackson shoot Elliott.
{¶ 15} Police recovered three cell phones in Elliott's car: Elliott's, Holland's, and Jackson's. Phone records established that Holland's phone was actually registered in Mario's name. The records also showed that two calls were made from Jackson's phone to Mario's phone before the incident on January 3, 2016: one at 2:11 p.m. and one at 2:48 p.m. One call was also made from Mario's phone to Jackson's phone at 2:30 p.m., and about an hour later, two more calls were placed from Mario's phone to Jackson's phone, at 3:24 p.m. and 3:26 p.m. Jackson's phone records also established that just before he met with Elliott, at 3:20 p.m., Jackson texted an unknown number, stating, "I'll talk to you later I'm bout to get that phone I want."
{¶ 16} At the close of the state's case, Jackson moved for a Crim.R. 29(A) acquittal, which the trial court denied. Jackson did not present any witnesses.
{¶ 17} The trial court found Jackson guilty of all counts and the specifications. For purposes of sentencing, the trial court merged the two felonious assault counts. The state elected to proceed on Count 1, felonious assault, in violation of R.C. 2903.11(A)(1). The trial court sentenced Jackson to a total of seven years in prison: three years on the firearm specifications to be served prior to and consecutive to four years on the base charge of felonious assault and 18 months for having a weapon while under disability, to be served concurrent to the sentence imposed for felonious assault. The trial court further notified Jackson that he would be subject to a mandatory term of three years of postrelease control upon his release from prison. It is from this judgment that Jackson now appeals.
II. Sufficiency and Manifest Weight of the Evidence
{¶ 18} In his first and second assignments of error, Jackson argues that his felonious assault convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
{¶ 19} When assessing whether the evidence presented at trial was sufficient to sustain a conviction, an appellate court reviews that evidence in a light most favorable to the prosecution to determine whether such evidence, if believed, would convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The proper inquiry is not whether the prosecution's "evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."
*1153 State v. Thompkins , 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Accordingly, a challenge to the sufficiency of the evidence tests whether the prosecution has met its burden of production at trial. Thompkins at 390, 678 N.E.2d 541.
{¶ 20} On the other hand, a manifest-weight challenge tests whether the prosecution has met its burden of persuasion. Id. On review from a manifest-weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387, 678 N.E.2d 541. When reviewing a challenge to the manifest weight of the evidence, we must be mindful of the fact that "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
{¶ 21} To prove beyond a reasonable doubt that Jackson committed felonious assault, the state had to establish each element of felonious assault. R.C. 2903.11(A) provides in pertinent part that "[n]o person shall knowingly" (1) "[c]ause serious physical harm to another," or (2) "[c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]"
{¶ 22} R.C. 2901.22(B) defines the culpable mental state for felonious assault. It provides that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."
{¶ 23} Jackson contends that his felonious assault convictions were not supported by sufficient evidence because the evidence supports the conclusion that "the gun was discharged accidentally during the struggle and [Elliott] was unintentionally harmed." Jackson, therefore, maintains that the evidence does not establish that he acted "knowingly." We disagree.
{¶ 24} Although Jackson is correct that only one spent shell casing was found in the car and there was no evidence of any bullet holes in Elliott's vehicle, Elliott and Whitted both testified that Jackson fired his gun into the vehicle once he had gotten out of the car. Their testimony alone is sufficient evidence to prove beyond a reasonable doubt that Jackson acted knowingly and fired a gun at Elliott from outside the car.
{¶ 25} Jackson further contends that Elliott's "credibility was so undermined by conflicting testimony that this court should not find that it was competent or credible." Jackson maintains that Elliott's entire "story" was "absurd." Jackson asserts that it is more likely that Jackson called Mario's phone to locate it and when Elliott answered, Jackson asked for his brother's phone back. Jackson further argues that Whitted should not be believed because he is Elliott's "close friend."
{¶ 26} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. State v. Bradley , 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, 2012 WL 2355778, ¶ 14, citing State v. DeHass , 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact-the trial judge in this case-is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." State v. Wilson , 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none *1154 of a witness's testimony." State v. Raver , 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, citing State v. Antill , 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Here, the trial judge heard Elliott's version of the events, as well as Jackson's theory of what occurred on the day of the shooting, and chose to believe Elliott over Jackson. The trial court was free to do so despite any inconsistencies or contradictions in Elliott's testimony.
{¶ 27} Jackson also claims that the physical evidence supports the conclusion that the gun went off accidentally during the men's struggle and that he did not fire the gun once he was outside of the vehicle. He points to the fact that Whitted testified that he only heard one shot and that only one spent shell casing was found in the car. Jackson contends that it makes more sense that Elliott was shot in the front seat where the shell casing was found. Jackson further argues that this conclusion is even more likely because most of the blood was found in the back seat, which he claims "suggests that the men continued fighting after the first shot in the front seat and that they continued to struggle for possession while [Jackson] was attempting to find a way out of the locked car." Jackson also maintains that if he had shot Elliott once he exited the vehicle, the blood would not be in the back seat because Elliott was "only leaning back at the time of the shot."
{¶ 28} After reviewing all of the evidence, we disagree with Jackson that this case is the "exceptional case" where the "evidence weighs heavily against the conviction." Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541. Although Jackson's theory as to what happened on January 3, 2016, is possible, it is just as likely that Elliott's version of the events occurred. Indeed, if Elliott was shot with his upper body in the back of the vehicle and then he leaned over to shut his back passenger door, it is just as likely that the blood would be on the back seat near that door-which is where most of the blood was found. Moreover, if Elliott had been shot in the front seat while the two men struggled, there likely would have been more blood in the front seat. Accordingly, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses and resolving the conflicts in the case, we do not agree with Jackson that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id.
{¶ 29} Jackson's first and second assignments of error are overruled.
{¶ 30} Judgment affirmed.
FRANK D. CELEBREZZE, JR., J., CONCURS;
TIM McCORMACK, P.J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION
TIM McCORMACK, P.J., CONCURRING IN JUDGMENT ONLY:
{¶ 31} I concur in judgment only with the holding of the majority affirming the conviction. I do though respectfully disagree with the determination that the defendant-appellant's version of the events in question is "just as likely" as the victim's version of the events. Neither the trier of fact nor I consider the evidence as presenting such an even balance of credibility and truth.
{¶ 32} Jackson claims that the victim was shot in the front seat where the shell casing was found, that the blood in the back seat suggests the men continued fighting and struggling for possession of the gun, and there would be no blood in the back seat if Jackson had shot the *1155 victim once he exited the vehicle because the victim was "only leaning back at the time of the shot." However, the victim testified that when Jackson pulled out a gun, the victim felt that he was going to be shot, that he would "lose [his] life," so the victim reached for the gun. During a struggle over the gun, he wound up between the front passenger seat with his legs in the front of the car between the two front seats and his upper body in the back passenger area. The victim stated that at this point, Jackson dove out of the passenger side rear door and that is when the victim heard a gunshot and realized he had been shot. Also, an eyewitness testified that he saw Jackson shoot the victim from outside of the vehicle while the victim was trying to close the back passenger door of his car, in which case the top half of the victim's body would be in the back seat. Moreover, most of the blood was discovered in the back passenger seat, which is consistent with the eyewitness testimony that the victim was shot while reaching to close the back passenger door.
{¶ 33} Although the alternate version of the events is physically possible, the totality of the evidence suggests it is not likely. Moreover, the evaluation of the evidence and the credibility of the witnesses are issues for the trier of fact. Here, the trier of fact considered the victim and the eyewitness to be more credible and found the evidence supported their testimony.
{¶ 34} Because the majority ultimately accepts the trial court's assessment of the witnesses' credibility, I agree with the majority's affirming the conviction.

Although Elliott refers to Jackson as "Woo" throughout his testimony, we will use Jackson.